**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

**ALEXANDER REALTY CAPITAL, INC.,**

**Plaintiff,**

**v.**

**LAUREL COVE DEVELOPMENT, LLC, and PHILIP JONES, individually,**

**Defendants.**

**Case No. 3:07-0755**
**Judge Trauger**

---

**LAUREL COVE DEVELOPMENT, LLC, a Tennessee limited liability company, PHILIP JONES, a Tennessee citizen, and TENTARA PARTNERS, INC., a Tennessee corporation,**

**Counter-Plaintiffs,**

**v.**

**ALEXANDER REALTY CAPITAL, INC., a Florida Corporation, and C. DAVID KOONTZ, a Florida citizen,**

**Counter-Defendants.**

**MEMORANDUM**

The court conducted a two-day bench trial of this matter on February 24-25, 2009. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court sets forth herein its findings of fact and conclusions of law.

## FINDINGS OF FACT

In February 2005, defendant and golf course community developer Philip Jones had the idea to build an approximately 770 home-site, residential golf course community in Williamson County, Tennessee, to be known as the "Laurel Cove" development (the "Project").[1] On February 14, 2005, Jones established and became the president of Tentara Partners, Inc., a corporate entity whose business it would be to develop this, and other, projects. Jones expected to earn more than 50 million dollars from the Project. First, however, in order to pay for the land and its development, Tentara Partners needed a loan of more than $100 million.

At the wedding of a mutual acquaintance in the spring or summer of 2005, Jones was introduced to David Koontz, who, along with his wife, owns and operates Alexander Realty Capital, Inc, (ARC), the plaintiff in this case. At this wedding, Jones told Koontz of the Project, and Koontz told Jones that ARC could, potentially, be of assistance as a "loan broker," that is, the entity that, for a fee, would help Tentara Partners obtain the nine-figure loan for the Project. After not being in contact for almost a year, Jones and Koontz renewed discussions of a loan broker arrangement in March 2006. In these discussions, Koontz mentioned that he had numerous contacts in the lending industry and was generally well-connected such that he was able to obtain favorable loans for his clients.

On June 19, 2006, Tentara Partners and ARC signed a loan brokerage agreement. Under this agreement, ARC would "assist" Tentara Partners in obtaining the loan for the Project, and, if

[1]No official transcript of the bench trial has been prepared, and, unless otherwise indicated, all references to the testimony are from the court's memory and notes.

a loan was made "from any financial institution to which [ARC] ha[s] introduced [Tentara Partners]," ARC would be entitled, as a fee, to a percentage of the total loan amount, that is, a three percent fee for equity financing and a one percent fee for debt financing. (Defense Exhibit 1.) The loan brokerage agreement provided no written guarantee that Jones or Tentara Partners would be permitted by the lender to retain ownership of the Project once it was financed. Indeed, the loan brokerage agreement was bereft of any guarantees that a loan would be found or that the loan would be of a certain quality or term.

From June 2006 to March 2007, Koontz used various means to assist Tentara Partners in obtaining the loan for the Project. These means included, among other things, making cold calls, conducting internet searches, setting up a website on which potential lenders could read information about the Project, and reaching out to established contacts in the lending industry. Koontz also involved a fellow loan broker and friend, Stuart Fromm, and asked Fromm to be "on the lookout," so to speak, for a lender who might be willing to finance the Project.

Despite these efforts, and Jones' own concession at trial that Koontz "worked hard" during this period, Koontz was initially unable to locate a lender for the Project, largely because of the low amount of owner equity in the Project. That said, the search for a lender was also hampered, in part, because of Koontz's recommendations that Tentara Partners invest a substantial amount of time in negotiations with a lender named First National, who eventually backed out of negotiations. Also, partially based on Koontz's recommendations, Tentara Partners paid $20,500 to potential lenders to evaluate the Project, before those lenders ultimately decided that they were not interested in making the loan.

Over this late 2006/early 2007 time period, Jones established additional entities to assist in his efforts to develop the Project. In August 2006, Jones established Tentara Properties, LLC, which was organized to sell the individual lots. In early 2007, Jones established Laurel Cove Development, LLC (LCD), which was owned by Tentara Partners and served as the land development company for the Project. Importantly, Tentara Properties, Tentara Partners, and LCD all operated out of the same office and, at this time, were all directed by Philip Jones. Consistent with this, Koontz testified that Jones used Tentara Properties and Tentara Partners as interchangeable terms. Koontz's testimony was credible, and the court believes, to someone outside of Tentara, Tentara Properties and Tentara Partners would have been indistinguishable. Further, Jones admitted at trial that Tentara Partners and Tentara Properties were "one in the same."

Because the options to buy the real property for the Project expired on May 15, 2007, it was vital that Tentara Partners locate a lender by May 15, 2007. Otherwise, the equity investments of several individuals at Tentara Partners (totaling $2,145,000), as well as Tentara's right to purchase the land, would be lost. With this deadline looming, at the request of Jones that Koontz reassure the investors, Koontz visited the offices of Tentara Partners on March 29, 2007 and met with some of these investors, including Jones, Lynn Crew, Tim Manus, and Mary Ray. Koontz assured these individuals that a loan for the Project would be obtained, and it was not a matter of getting the loan, but, rather, it would be a matter of Tentara Partners choosing the best of the loans available. Indeed, Koontz showed these individuals a list of lenders with whom he supposedly had contacts, to impress upon them the range of choices that would be available.

Despite these assurances, after this meeting, Jones contacted Paul Bell, another loan broker, about whether Bell could find a lender for the Project.

Meanwhile, Stuart Fromm, in his search on behalf of Koontz, was referred to Oberon Securities ("Oberon"), which viewed the Project as a potential loan brokerage opportunity. In April 2007, after positive discussions between Fromm, Jones, Koontz, and Ron Oertell at Oberon, LCD and Oberon entered into a loan brokerage agreement. This agreement provided that, if a loan was secured, LCD would pay Oberon, as a fee, a percentage of the loan amount. (Plaintiff Exhibit 4.) The fee was substantial, that is, seven percent of equity financing and two percent of debt financing. Similar to the ARC brokerage agreement, this agreement did not guarantee that a loan would be made, that the loan would be of a certain quality, or that the loan recipient would be allowed by the lender to continue ownership of the Project once it was financed.

On April 12, 2007, the loan brokerage agreement between Tentara Partners and ARC was replaced by a new loan brokerage agreement between LCD and ARC, in recognition of the fact that Tentara Partners had created LCD for this Project. In contrast to the previous loan brokerage agreement between ARC and Tentara Partners, this agreement called for a flat, two percent brokerage fee to be paid to ARC from the proceeds of the loan. (Plaintiff Exhibit 3.) For purposes of this case, this loan brokerage agreement was otherwise substantively unchanged from the June 19, 2006 agreement.

In April 2007, Oberon approached Lehman Brothers Holdings ("Lehman") about making the loan for the Project. After meeting with many of the principles (not including Koontz) in

New York City in April 2007, Lehman decided that it would be interested in financing the Project. On April 27, 2007, three days after presenting a term sheet for a $114 million loan to LCD, Lehman announced an additional condition of the financing. That is, Lehman announced that the brokerage fees, in total, could not exceed one percent of the total loan. As noted above, both the Oberon and ARC brokerage agreements independently called for Oberon and ARC to receive more than one percent of the total loan as their brokerage fee.

Immediately after Lehman's announcement, with the May 15 deadline looming, discussions began amongst LCD, Oberon and ARC as to how to divide the brokerage fee in light of Lehman's restrictions. Oertell informed Jones that Oberon felt that it was entitled to 80 percent of the brokerage fee, mostly because of Oberon's role in locating Lehman, the eventual lender. Jones was frustrated with Oberon's position, writing to his lawyer, Will Cheek, on April 27, "what will piss me off is, if Oberon does not split with David [Koontz]. We will take care of David over time from our profits of Laurel Cove. David will need an agreement with us and *some how we get him some money after closing* and additional money as we go through the project." (Plaintiff Exhibit 5.) (emphasis added)

Jones communicated Oberon's position to Koontz and, over the next two days, the two discussed via phone and e-mail, at times heatedly, whether Koontz should accede to the 80/20 split, whereby Oberon would get 80 percent of the approximately $1,040,000 brokerage fee and Koontz would get 20 percent, or approximately $208,000. After indicating on April 28 that he would accede to the split, on April 29, Koontz e-mailed Jones and Cheek and announced that he could not agree to the "drastic reduction" in his commission. (Defense Exhibit 14.) Following

this e-mail, Koontz and Jones had a heated telephone conversation, and, at one point, Koontz threatened to pursue an injunction to prevent the closing of the deal. Jones threatened to secure the loan from another lender brought to him by broker Paul Bell, which would have cut Koontz out of all commissions. After this conversation, however, Jones e-mailed Koontz and stated:

> The following is a confidential E-mail for the Recipient Only. ... This e-mail is not to be shared with any other parties. Laurel Cove Development, LLC will pay Alexander Realty Capital $300,000 on or before July 1, 2007 for services related to Tentara Properties, LLC. This is (sic) agreement to pay the mentioned $300,000 is only enforceable and agreed to by Laurel Cove Development, LLC after David Koontz, owner of Alexander Realty Capital, signs the [Amendment to the Engagement] agreement presented today between Oberon and Alexander with Laurel Cove Development, LLC.
>
> (Defense Exhibit 15.)

The e-mail contained Jones' standard e-mail "signature," providing his name, corporate title, address, office phone number, fax number, cell phone number, and e-mail address. (*Id.*)

On April 29, 2007, after this e-mail was sent, Koontz signed the Amendment to the Engagement Agreement, thereby agreeing to the 80/20 split. In so doing, Koontz removed a substantial, perhaps impenetrable, roadblock to closing the Lehman loan, which was set to close on May 15, 2007. As noted above, closing by May 15, 2007 was a key concern to the investors at Tentara Partners, who stood to lose their entire $2,145,000 investment if the Project was not funded by May 15, 2007. Indeed, in his testimony, Jones conceded that he made the offer described in the April 29 e-mail to induce Koontz to sign the Amendment to the Engagement Agreement. Consistent with the confidential nature of the April 29 e-mail and related "side deal," Koontz and Jones did not discuss the bargain with the other principals in this matter,

including Lehman, Oertell, and Cheek. Further, Jones did not note the obligation in the books and records of LCD.

On May 7, 2007 Lehman notified Jones that, because of Jones' past bankruptcies and lawsuits against him related to previous ventures, Lehman would be unable to make the loan to LCD with Tentara Partners as its owner. Lehman wanted Kenneth Jowdy, a Las Vegas businessman whom Lehman had done business with, to take over ownership of the Project from Tentara. On May 8, 2007, Jones and Jowdy met and reached an agreement, whereby Tentara Partners would transfer its entire interest in LCD to Jowdy. In exchange, Tentara Partners had the option, to be exercised at a later date, of either (1) immediately receiving its $2,145,000 investment in the Project back from LCD/Jowdy and ending its association with the Project or (2) receiving management fees and salaries for its employees from LCD/Jowdy and managing the Project. Under option two, once the Project was completed and certain conditions were met, Tentara Partners would be entitled to receive its $2,145,000 investment back, plus profits from the Project.

On May 15, 2007, Tentara Partners formally assigned its ownership interest in LCD to Jowdy, who became the president of LCD and, under the conditions demanded by Lehman, Jones ceased to be an officer or owner of LCD. On that same day, the Lehman loan of $121,000,000 closed and $200,000 was wired to Koontz's bank account, as a brokerage fee. By mistake, an additional $8,000 was not wired at that time but was wired after the closing date.

Tentara Partners ultimately opted to receive management fees and salaries from LCD. Currently, LCD pays Tentara Partners $400,000 per year in project management fees to manage

the Project. LCD also pays salaries to Tentara Partners' employees for their work on the Project, including Jones' $150,000 per year salary. Tentara Partners also stands, if certain challenging conditions of project development are met, to receive its $2,145,000 investment back, along with profits from the Project.

The defendants never paid ARC the $300,000 discussed in the April 29 e-mail. Jones concedes that, at the time ARC signed the Amendment to the Engagement Agreement, Jones believed that he had a $300,000 obligation to ARC. Indeed, Jones intended to pay ARC from the $9 million in marketing funds for the Project contained in the Lehman loan, had Tentara remained the owner. The defendants' current position, however, is that the $300,000 is not owed because it was for future mortgage broker services for the sale of the Project lots, to be paid by Tentara Properties, the Tentara entity identified in the April 29 e-mail. The defendants argue that, because Jones had to give up his ownership interest in the Project, these future services could not be performed as the parties envisioned on April 29. Jones claims that he determined that the $300,000 was not owed as soon as he knew that he would lose his interest in the Project, but Jones did not tell Koontz of his determination until July 2007. Within a few weeks of Jones informing Koontz of Jones' position on this matter, Koontz filed this lawsuit.

## CONCLUSIONS OF LAW

The plaintiff, ARC, contends that the defendants, LCD and Jones, breached the contract offer made in the April 29, 2007 e-mail and accepted by Koontz. ARC also contends that the defendants engaged in promissory fraud and misrepresentation and that the defendants' fraudulent behavior entitles the plaintiff to punitive damages. The plaintiff also seeks pre-

judgment interest. The defendants assert numerous affirmative defenses. In their counterclaim, counter-plaintiffs Tentara Partners, LCD and Jones claim that ARC and Koontz breached the brokerage agreements and the April 29, 2007 Amendment to the Engagement Agreement, violated the Tennessee Consumer Protection Act (TCPA), T.C.A. § 47-18-101 *et seq*., and engaged in intentional and/or negligent misrepresentation. The counter-plaintiffs abandoned their invasion of privacy claim at trial after the court observed that Jones had not asserted the claim or testified about it. The counter-defendants, ARC and Koontz, seek attorneys' fees for defending against the counter-plaintiffs' TCPA claim. The court will address the merits of the plaintiff's claims and the affirmative defenses and will then turn to the merits of the counterclaims.

## I. ARC's Claims

ARC's *prima facie* claim for breach of contract is clearly established. In Tennessee, "in order to be enforceable, a contract must represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and must not be contrary to public policy." *T.R. Mills Contractors v. WRH Enters., LLC*, 93 S.W. 3d 861, 865 (Tenn. Ct. App. 2002). Here, the findings of fact discussed above plainly show that the deal embodied in the April 29 e-mail represents a valid, enforceable, stand alone contract, unconnected to and unincorporated into any other agreement in this case. As plaintiff's counsel repeatedly pointed out at trial, this is a classic "side deal."

This "side deal" is fully enforceable under the conditions outlined above. Both parties, LCD and ARC, agreed that, if ARC would sign the Amendment to the Engagement Agreement,

LCD would pay ARC $300,000. Mutual assent and the definite nature of the terms are obvious. The consideration is equally clear. That is, ARC would receive cash and LCD would receive the removal of a substantial, if not impenetrable, roadblock to closing. While LCD was under much pressure to close the loan, there is no indication of fraud or undue influence by ARC; indeed, it was LCD who proposed the deal. While, as ARC's attorney conceded at trial, this contract is not particularly "likeable" and is a "side deal" cloaked in secrecy, the defendants presented no basis for this contract to be voided on public policy grounds.[2]

This enforceable contract was also clearly breached. It is well-settled that, in Tennessee, a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract; and (3) damages caused by the breach of the contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W. 3d 367, 374 (Tenn. Ct. App. 2006). It is obvious that all three conditions are met, that is, there was an enforceable contract, the defendants never paid the $300,000, and there were damages caused by the breach, that is, ARC never received its $300,000.

The defendants attempt to avoid liability on this contract by asserting a bevy of affirmative defenses to enforcement, none of which has any merit. Most notably, the defendants

---

[2] The defendants made two equally unmeritorious arguments that no contract was formed. First, apart from any statute of frauds argument, the defendants argued that, because the April 29 e-mail was not signed, by hand, it does not embody a valid contract. The defendants provided absolutely no support for this position, which would seem to require that no contractual agreements could be formed unless they were accompanied by a handwritten signature, a notion that is clearly inconsistent with fundamental principles of contract law. Second, the defendants argued that there was no contract here because Koontz took varying positions as to whether he would agree to the reduced commission. This argument ignores the fact that, at the relevant time, April 29, a contract was formed.

assert the affirmative defense of mutual mistake. The defendants argue that, at the time of contracting, they considered the $300,000 to be payment for Koontz's future mortgage broker services for the Project on behalf of Tentara Properties, LLC.

There are several problems with the defendants' mutual mistake argument, but the court need only address a few of them. First, the notion that, at the time of contracting, the defendants believed that the $300,000 was for "future services" makes little sense. Virtually everything about the context in which the contract was formed indicates that LCD agreed to pay ARC $300,000 to sign the Amendment to the Engagement Agreement, thereby allowing the loan to close. Koontz's testimony that it would be "completely out of place" to be negotiating future services in this context strikes the court as correct. Moreover, both Koontz and Will Cheek testified that the mortgage business on the sale of the lots (the "future services") was a lucrative opportunity for Koontz and that Jones would by no means have paid Koontz $300,000 to accept it. Second, even if the parties were somehow mutually mistaken, the party seeking relief for a mutual mistake must prove that it suffered a loss as the result of the mistake. *Loveday v. Cate*, 854 S.W. 2d 877, 880 (Tenn. Ct. App. 1993). The defendants have come forth with no evidence that they suffered any loss as the result of any mistake; indeed, the defendants got the benefit of the bargain, that is, Koontz removed the potential roadblock to closing. The defendants' mutual mistake affirmative defense is without merit.

The defendants also cite the affirmative defense of the "implied covenant of good faith and fair dealing." The gist of the defendants' argument, presented in a somewhat confused manner during closing, is that the court must impose a fair and reasonable construction on every

contract before it.  The court views this covenant as related more to the obligations of the parties to a contract; that is, the parties to a contract, impliedly, covenant to perform the contract in good faith and fairly.  *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (under Tennessee law, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement").  Even adopting the defendants' interpretation, however, the construction the court is imposing is fair and reasonable and allows all parties to receive the bargain they negotiated.

Next, the defendants cite the affirmative defense of "accord and satisfaction" and "waiver," which they presented jointly during closing argument.  The defendants argue that, by initially accepting the 80/20 split, Koontz entered into an "accord and satisfaction" of the reduced brokerage fee offered to him, and Koontz also waived the right to receive any additional brokerage fee monies.  There are two problems with this argument.  First, as the plaintiff points out, for accord and satisfaction to apply, the "accord' agreement would have to be a substitute for the April 29 e-mail agreement, and there is no evidence of such an "accord" agreement.  *Lytle v. Clopton*, 261 S.W. 664, 667 (Tenn. 1924).  Second, there is no evidence that ARC waived any right or benefit, that is, in any way, made any declaration or committed any act that indicated that ARC was abandoning its right to the $300,000.  *See Collins v. Summers Hardware and Supply Co.*, 88 S.W. 3d 192, 201 (Tenn. Ct. App. 2002).  Therefore, both of these affirmative defenses are without merit.

Next, the defendants assert that the plaintiff is not entitled, in equity, to recover for breach of contract because the plaintiff has "unclean hands," that is, ARC acted unethically by

not informing the other principals that it had a $300,000 side deal with the defendants. Defendants argue that this conduct may have influenced the fees that other principals, such as Oberon, demanded and may have influenced whether the deal closed at all. The unclean hands argument is without merit for at least two reasons.

First, the conduct that the defendants complain about did not injure or damage the defendants, which is a requirement of this affirmative defense. *See Nolen v. Witherspoon*, 187 S.W. 2d 14, 16 (Tenn. 1945). Second, even assuming that the court was in the position to set aside the contract because of the plaintiff's supposedly inequitable conduct toward other principals in this matter, it would be improper for the court to do so. In not divulging the agreement, the plaintiff was merely following the explicit instructions of a contract that had been drafted and proposed by the defendants. It would be most inequitable to reward the defendants because they now complain that the plaintiff followed their explicit instructions.

Next, the defendants assert the affirmative defense of equitable estoppel. The defendants argue that ARC concealed what it believed the $300,000 payment was for, and the defendants relied on that concealment to their detriment. *See Roach v. Renfro,* 989 S.W. 2d 335, 339 (Tenn. Ct. App. 1998) (describing false representation or concealment of material facts as one element of the doctrine of equitable estoppel). Once again, the facts discussed above simply do not support the defendants' position, as there is no evidence that ARC concealed anything from the defendants. Rather, the facts show that the defendants presented ARC with a contract that said, in essence, "we will give you $300,000 if you sign another agreement." This is simply not a case that warrants application, or even discussion, of the doctrine of equitable estoppel.

Similar problems exist with the defendants' affirmative defense of duress. The gist of the defendants' duress argument is that, after providing ineffective assistance as a loan broker, Koontz waited until the last minute to tell the defendants that he would not sign the Amendment to the Engagement Agreement, forcing the defendants to either abandon the Project or pay Koontz a substantial amount of money to get his signature. None of this implicates the affirmative defense of duress, as duress is "defined as a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do an act or make a contract not of his own volition, but under such wrongful external pressure." *Barnes v. Barnes*, 193 S.W. 3d 495, 500 (Tenn. 2006) (internal quotation omitted). Here, there is no evidence that the plaintiff imposed any such wrongful external pressure. It is true that Lehman's requirements gave the plaintiff leverage, but using leverage is very different from imposing duress. *Id.* The defendants did not lose their free agency here; rather they made a calculated decision that it was easier to promise to give the plaintiff an additional $300,000 from a nine-figure loan than it was to try and find a new lender on very short notice. Duress is simply not implicated here.

The final affirmative defense raised by the defendants is breach of contract.[3] That is, the defendants argued that, because the plaintiff supposedly breached the Amendment to the Engagement Agreement, they are not liable to the plaintiff for the $300,000. The basis of this argument is that the Amendment to the Engagement Agreement provides that the plaintiff would not seek "any further commission" from LCD, "unless the final amount of the loan ... exceeds

---

[3] The defendants abandoned their "statute of frauds" argument at trial.

the amount set forth in the [Lehman] term sheet, not to exceed one percent of the amount loaned ... ." (Plaintiff's Exhibit 21.)

First, the "final amount of the loan" *did* exceed the amount set forth on the term sheet, which, technically, frees ARC to pursue any commission up to one percent of the amount loaned. As the final amount loaned was $121,000,000 as opposed to the original $114,000,000, this provision does not restrict the plaintiff from seeking additional commissions from LCD, above the $208,000 it received at closing. Second, and more importantly, the $300,000 is not fairly viewed as a "commission." A commission would be paid at closing as a strict percentage of the loan amount. The $300,000 was what LCD and ARC viewed as the fair value of ARC's removing a possible roadblock to closing. Therefore, the defendants' breach of contract affirmative defense is without merit.

Therefore, the court finds that the defendants have no viable affirmative defenses to the plaintiff's breach of contract claim and that the plaintiff is entitled to $300,000 in damages for the defendants' breach of contract.

The court concludes that the plaintiff's breach of contract claim is the only claim by the plaintiff with merit. The plaintiff did claim that the defendants had engaged in promissory fraud and misrepresentation in connection with the April 29 e-mail. The misrepresentation argument was not developed at trial and is, therefore, rejected. As to promissory fraud, one requirement of such a claim is that the party committing the alleged fraud have lacked the intent, *at the time of contracting*, to fulfill the promise made. *See Shahrdar v. Global Housing, Inc.*, 983 S.W. 2d 230, 237 (Tenn. Ct. App. 1998). ARC put forth no convincing evidence that, at the time Jones

sent the April 29 e-mail to Koontz, LCD lacked the intent to fulfill the promise. Rather, the evidence at trial indicated that Jones did intend to pay Koontz the $300,000 when he offered it. As for the evidence presented at trial that Jones did not tell any of the other principals of the $300,000 obligation and did not note the obligation in the books and records of LCD, the court views that conduct as consistent with the "secret, side deal" nature of the contract. The plaintiff, therefore, has failed to put forth sufficient evidence of promissory fraud. As the plaintiff's argument for punitive damages was based on this supposed fraud, the plaintiff is not entitled to punitive damages. The court now turns to the counterclaims.

## II. Counterclaims of LCD, Tentara Partners, and Jones

As noted above, the counter-plaintiffs LCD, Tentara Partners and Jones asserted a counterclaim against ARC and Koontz, alleging breach of contract, violations of the TCPA, and intentional and/or negligent misrepresentation. For damages, the counter-plaintiffs claim that they are entitled to the equity that individuals at Tentara Partners put into the Project before the Project was turned over to Jowdy ($2,145,000) and the fees that Tentara Partners paid to other potential lenders, at Koontz's recommendation, to examine whether a loan should be made to Tentara Partners for the Project ($20,500). By the court's calculations, the counter-plaintiffs' requested damages are $2,165,500.

### A. Breach of Contract

As discussed above, the argument that ARC and Koontz breached the Amendment to the Engagement Agreement by pursuing additional commissions is without merit. The counter-plaintiffs have also alleged that ARC and Koontz breached the loan brokerage agreements

because, to summarize the argument, "ARC agreed to obtain project financing with an understanding that Tentara Partners and/or Jones would retain ownership of LCD," and, in the end, the counter-plaintiffs were left with no choice but to obtain a loan from a company that ARC and Koontz did not find and under conditions that required Jones and Tentara Partners to give up ownership interest in the Project.[4] (See Docket No. 60 at 29.)

Plainly, no valid breach of contract claim is implicated here. The effective April 12, 2007 brokerage agreement makes no guarantee that ARC will obtain any loan, let alone a loan under certain terms and conditions. (Plaintiff Exhibit 3.) Indeed, the agreement only states that ARC will "assist[]" LCD in locating a lender and explicitly states that "the parties to this agreement hereby acknowledge and agree that [ARC's] services shall be limited to that of an advisor and loan consultant in order to enable [LCD] to obtain [LCD's] proposed loan." (*Id.*) In short, there is nothing about the loan brokerage agreement indicating that ARC and Koontz somehow breached that agreement because, with all its terms and conditions, Lehman ended up as the lender for the Project[5].

**B. TCPA Claim**

---

[4] It is not completely clear which aspects of the breach of contract claim were intended to be asserted as an affirmative defense and which were intended to be asserted as a counterclaim. The court has tried to organize the arguments logically, but, suffice it to say that neither breach of contract theory offered by the defendants/counter-plaintiffs has any merit as a counterclaim or as an affirmative defense.

[5] This conclusion is reinforced by the fact that Jones admitted at trial that Oertell of Oberon had represented that he could find a lender who would not require Jones to give up ownership. Oertell/Oberon, more directly than Koontz, brought to Jones the Lehman deal, which required Jones to give up ownership, and yet Oertell/Oberon were not included as defendants on the counterclaims.

The counter-plaintiffs also allege that ARC and Koontz engaged in "unfair or deceptive acts or practices" in violation of the Tennessee Consumer Protection Act. *See* T.C.A. § 47-18-104. To recover under the TCPA, the plaintiff must prove (1) that the defendant engaged in an "unfair or deceptive act or practice declared to be unlawful" by the TCPA and (2) that the defendant's conduct caused "an ascertainable loss of money ... or thing of value ... ." T.C.A. § 47-18-109(a)(1).

In support of their TCPA claim, the counter-plaintiffs argued that Koontz, throughout the loan acquisition process, falsely held himself out to be a well-connected loan broker who could secure the financing needed for the Project. Specifically, the counter-plaintiffs point to the March 29, 2007 meeting, in which Koontz told investors at Tentara Partners that the issue was not whether he would find the loan, but which loan Tentara Partners would choose. Mr. Manus also testified at trial that Koontz told these investors that Tentara Partners would be able to retain ownership of the Project. The counter-plaintiffs argue that this conduct ran afoul of the TCPA. As for the specific "unfair or deceptive act or practice declared to be unlawful by the TCPA" relied upon, presumably, the counter-plaintiffs rely on the general provision stating that it is unlawful to "engage in any [] act or practice which is deceptive to the consumer or to any other person" and the more specific provision that makes it unlawful to represent that a "consumer transaction confers or involves rights ... that it does not have ... ." T.C.A. § 47-18-104(b)(27); T.C.A. § 47-18-104(b)(12).[6]

[6] Someone who obtains loan broker services by contract would be considered a consumer covered by the protections of the TCPA. See T.C.A. § 47-18-103(2).

Examining the counter-plaintiffs' alleged damages, it becomes evident that their TCPA claim is not sustainable. First, as to the $2,145,000 in equity investments, the counter-plaintiffs never articulated a credible theory for how the conduct of ARC and Koontz affected the equity investments in any way. Rather, the evidence indicates that these investments were made apart from ARC's role in the Project. Simply, there is no connection between the allegedly deceptive acts of ARC and Koontz and the $2,145,000 in alleged damages.[7]

As to the $20,500 that the counter-plaintiffs spent for other potential lenders to evaluate the Project, again, the counter-plaintiffs fail to tie that expense to any deceptive act of ARC and Koontz. The only arguably relevant allegation of deceptive conduct here is that Koontz "recommended" that the counter-plaintiffs pay the fees and pursue the loans with those companies. A loan broker recommending, in good faith, a course of conduct that turns out not to be fruitful is not unfair and deceptive conduct. Plainly, the counter-plaintiffs do not have a viable TCPA claim.

**C. Misrepresentation**

Finally, based on the same factual allegations that supported the TCPA claim, the counter-plaintiffs assert that ARC and Koontz engaged in intentional and/or negligent misrepresentation. As contrasted with the TCPA claim, however, the realm of conduct about which the counter-plaintiffs can complain for misrepresentation purposes is more limited because an actionable misrepresentation must be a statement of fact regarding past or present

[7]Further, the $2,145,000 does not appear to be "damages," as Tentara Partners made the conscious decision, after ARC was no longer involved in the Project, to keep this money in the Project.

events. *See Shahrdar*, 983 S.W. 2d at 237. Therefore, based on the facts of this case, only Koontz's alleged statements about his experience in the industry and his connections could fairly be considered relevant for purposes of the counter-plaintiffs' misrepresentation claims.

Again, there are numerous problems with these claims, and it is not necessary to address them all. Suffice it to say that, in order to succeed on a claim for either negligent or intentional misrepresentation, the counter-plaintiffs must show that they justifiably relied on Koontz's statements about his connections in the industry. *Williams v. Berube & Assoc.*, 26 S.W. 3d 640, 645 (Tenn. Ct. App. 2000). Despite repeated questioning at closing, the counter-plaintiffs failed to articulate how their supposedly blind reliance on Koontz's "puffery" about his contacts and abilities could possibly be justifiable. The counter-plaintiffs are sophisticated businesspeople who were seeking a nine-figure loan. Their claim that they were duped out of more than $2 million by the self-promotion of a loan broker is not sustainable. Among other things, because the counter-plaintiffs cannot establish justifiable reliance, their misrepresentation claims fail.

## III. Additional Issues

As noted above, the plaintiffs have asked for pre-judgment interest at a ten percent annual rate, the maximum amount allowed by Tennessee law and the minimum rate at which Koontz testified he would have loaned $300,000 to Jones. T.C.A. § 47-14-123. The decision whether or not to award pre-judgment interest is left to the "sound discretion" of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W. 2d 920, 927 (Tenn. 1998). The baseline principle is whether it is "fair," under principles of equity, to award pre-judgment interest. *Id.* "If the existence or amount of an obligation is certain, this fact will help support an award of prejudgment interest as

a matter of equity." *Id.* at 928.

The court finds that the award of pre-judgment interest is appropriate in this case. In the court's view, not only is the amount of the obligation certain, but the existence of the obligation should have been certain to the defendants from the date the obligation was due. Under the plain terms of the April 29 e-mail, ARC's obligation was indisputably performed when ARC signed the Amendment to the Engagement Agreement, and there is no question that, at that point, ARC was entitled to $300,000 on July 1, 2007. Instead of paying that obligation, the defendants, apparently feeling that the bargain was no longer "worth it" because Jones had lost his ownership interest in the Project, have put up smokescreen after smokescreen by way of affirmative defenses and counterclaims, none of which has merit.

Therefore, the plaintiff will be awarded pre-judgment interest at ten percent per year, dating from the date the obligation was due on July 1, 2007 through, for simplicity's sake, the end of February 2009. By the court's calculation, the plaintiff is entitled to $50,000 in pre-judgment interest.[8]

ARC and Koontz also request, under T.C.A. § 47-18-109(e)(2), attorneys' fees and costs on the ground that the TCPA claim asserted by the counter-plaintiffs asserted was frivolous. This provision of the TCPA states: "in any private action commenced under this section, upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for

[8] To reach this conclusion, the court took the judgment amount ($300,000) and multiplied that by the annual interest rate (10 percent) and multiplied that number ($30,000) by the number of years that had gone by since the amount became owing (1.667).

any damages incurred, including reasonable attorney's fees and costs." T.C.A. § 47-18-109(e)(2).

In *Glanton v. Bob Parks Realty*, the Tennessee Court of Appeals discussed this provision and its potential complications at length. 2005 WL 1021559, *9-11 (Tenn. Ct. App. Oct. 24, 2005). The *Glanton* court stated that, even if the trial court concludes that the TCPA claim is frivolous, without merit, or brought for purposes of harassment, the decision to award attorneys' fees is not mandated, but remains within the sound discretion of the trial court. *Id.* at *9. The *Glanton* court also discussed two challenges to applying this provision. One, there might be a chilling effect on future, legitimate TCPA claimants, and, two, it is difficult to impose attorneys' fees in a case in which many claims have been asserted, not just a TCPA claim. *Id.* at *9-10.

As should be clear from the substantive discussion of the TCPA claim above, the court agrees with ARC and Koontz that the TCPA claim was brought, and pursued through trial, merely to keep Mr. Koontz "up at night," and that the claim is frivolous. Further, the court does not believe that imposing attorneys' fees and costs on the counter-plaintiffs will chill legitimate plaintiffs who would easily be able to see the distinction between viable claims and the claims asserted by the counter-plaintiffs.

That said, the court faces the same challenge as in *Glanton*, that is, how to tax attorneys' fees and costs in a case in which numerous claims were asserted. In *Glanton*, the plaintiff asserted a frivolous TCPA claim and another, ultimately unsuccessful but more meritorious, claim. *Id.* The court recognized that it "would be nearly impossible to accurately separate the legal costs incurred for defending one claim from those incurred for defending the other." *Id.*

Further asking the parties to try to calculate those costs after the claims were resolved would result in the parties' "incur[ring] additional fees for an exercise of dubious value." *Id.* at *11. The court decided that the TCPA plaintiff would be responsible for one-half of the defendants' attorneys' fees. *Id.*

Here, the circumstances are slightly different from *Glanton* because ARC initiated this litigation and thereby assumed an increased risk that substantial attorneys' fees and costs would be incurred, counterclaims would be filed, and vexatious litigation tactics would be used. That said, the court is convinced that, from the day the counterclaim was filed through the end of the two-day bench trial, the counter-plaintiffs here should have recognized the baselessness of the TCPA claim, such that some invocation of section 109(e)(2) is appropriate.

In their proposed findings of fact and conclusions of law, ARC and Koontz noted that they will "incur attorneys' fees in the amount of forty percent of the total amounts recovered ... as a result of being required to bring this action and to defend the counterclaims ..." (Docket No. 61 at 14.) Plainly, the bulk of this contingency fee is attributable to the work plaintiff's counsel performed in pursuing the plaintiff's case in chief. Indeed, before the counterclaim was asserted, the plaintiff and his attorney had a fee agreement that called for a 33.33 percent contingency fee. (Plaintiff Exhibit 22.) Mr. Koontz testified at trial that this fee increased to forty percent once the counterclaims were filed. (*See id.*) Based on its understanding of the case, the court concludes that slightly more than half of this increase in fee is attributable to the TCPA claim, which, unlike the common law claims asserted in the counterclaim, requires that the attorney navigate a statutory framework. Therefore, the court concludes that four percentage

points of the 6.67 percent increase are fairly attributable to defending the TCPA claim, that is, the counter-plaintiffs are entitled under this provision of the TCPA to four percent of the total recovery. Four percent of $350,000 is $14,000, which the court will award to ARC and Koontz as attorneys' fees for defending the counter-plaintiffs' frivolous TCPA claim.

## CONCLUSION

For the reasons discussed above, judgment will be entered for the plaintiff, Alexander Realty Capital, Inc., in the amount of $350,000. Additionally, the counter-plaintiffs will owe the counter-defendants $14,000 in attorneys' fees for asserting a frivolous TCPA claim.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge